STATE OF NORTH CAROLINA v. RALPH EDWARD GRAY

No. COA10-307

(Filed 5 April 2011)

**Evidence— prior crimes or bad acts—eighteen years earlier— probative value outweighed by prejudicial effect—reasonable probability of different result**

The trial court committed prejudicial error in a first-degree sexual offense and taking indecent liberties with a child case by admitting evidence that defendant had sexually assaulted a four-year-old boy eighteen years before the alleged sexual assault in this case. Any probative value of the evidence was substantially outweighed by the danger of unfair prejudice and there was a reasonable possibility that, had the improper evidence not been admitted, a different result would have been reached at trial.

Appeal by Defendant from judgments entered 11 June 2009 by Judge John G. Caudill in Superior Court, Cleveland County. Heard in the Court of Appeals 12 October 2010.

*Attorney General Roy Cooper, by Assistant Attorney General R. Kirk Randleman, for the State.*

*Appellate Defender Staples ·Hughes, by Assistant Appellate Defender David W. Andrews, for Defendant-Appellant.*

McGEE, Judge.

Defendant was indicted by a grand jury on 22 September 2008 on one count of first-degree sex offense and one count of taking indecent liberties with a child. A jury found Defendant guilty of both charges on 11 June 2009. The trial court found Defendant to have a prior record level II, and sentenced Defendant to consecutive active sentences of 288-315 months for the first-degree sex offense and to 19-23 months for taking indecent liberties with a child.

Trial testimony indicated the following: At the time of the alleged incident, the alleged victim (the child) was five years old and lived with her maternal grandparents (the grandparents). The child's uncle also lived with the grandparents. The uncle had befriended Ralph Edward Gray (Defendant), and Defendant and the uncle spent a lot of time together, including time at the grandparents' house. The child's mother testified that she was at the grandparents' house one day in

June or July of 2008. As she approached a bedroom in the grandparents' house, she "observed [the child] lying across the bed and . . . saw her like kick a leg. I couldn't actually see [Defendant] until I came around the corner; then that's when he jumped back." The mother clarified that she "couldn't see if [Defendant] was standing or what. All I know is I saw him jump back and I saw her like kick her leg and I came around the corner . . . . And that's all I saw." The mother then questioned the child about the incident, and the child said that Defendant "was trying to touch her." The mother testified that the child told her Defendant had touched the child inside her vagina. The child also told her mother that she felt "stinging" in her vaginal area. The mother testified that it was not unusual for the child, or girls in general, to feel "stinging" in that area on occasion.

The mother took the child home with her. The mother kept the shorts, shirt, and underwear that the child had been wearing and did not wash them. The mother subsequently gave those clothes to a detective. The mother gave the child a bath that night after the alleged incident, but did not "notice anything" abnormal while bathing the child. The following morning, the mother called the Children's Clinic in Shelby to have the child "checked out."

Dr. Charles Hayek (Dr. Hayek) of the Children's Clinic testified that he examined the child on 12 August 2008. Dr. Hayek testified that the child complained "about holding her urine and burning with urination[.]" Dr. Hayek testified that burning with urination was a very common complaint with younger girls and was often the result of improper wiping after urination, which could cause a yeast infection. Dr. Hayek further stated that in the summer, a burning sensation was a particularly common complaint due to the wearing of bathing suits or other wet clothing. When asked by the prosecutor whether a burning sensation was "particularly indicative of sexual abuse[,]" Dr. Hayek answered: "No, ma'am." The child had previously been treated by Dr. Hayek for the same burning sensation complaint. Dr. Hayek did testify that digital penetration of the child's vagina could have caused the burning sensation.

Dr. Hayek was informed by the mother that the child might have been sexually assaulted the day before. Dr. Hayek asked the child why she was at the Children's Clinic and the child replied that her uncle's friend[1] (the man) had been rubbing her bottom when the child was at the grandparents' house. When asked to show where the man

---

1. According to Dr. Hayek, the child did not remember the name of her uncle's friend when Dr. Hayek asked her.

had been rubbing her, the child pointed to both her bottom and her vaginal area. The child also told Dr. Hayek that the man had inserted his finger in her "cat," which the child identified as her vagina. The child told Dr. Hayek that when that happened, her clothes were on and the man had reached underneath her clothes to touch her.

When Dr. Hayek examined the child, he noticed an injury to her hymen that had healed. He testified that this type of injury would be consistent with "a penetrating injury . . . or a stretching." Dr. Hayek explained that this kind of injury could be consistent with the insertion of a man's finger into a child's vagina, or something else that penetrated the vagina. Dr. Hayek testified that the injury to the child's hymen was consistent with what the child had told him concerning the touching. Dr. Hayek testified that this kind of scarring on the hymen would have led him to report possible sexual abuse even had there been no suspicion of sexual abuse prior to the examination. The scarring Dr. Hayek observed on the child's hymen "would have had to [have] been . . . at least several weeks old." It was not a fresh injury "because it was already healed[.]" The injury could have been sustained as early as October 2005.

Terre Bullock (Bullock) from the Children's Advocacy Center conducted a forensic interview with the child on 28 August 2008. Bullock testified that the child was "very, very smart[,]" and that the child knew "all of her family members and—and could name them. In fact, she could name them faster than I could write." Bullock also testified that the child "could even tell [Bullock] those that were— that didn't have children yet but had one on the way[.]"

The child testified at trial. The child described the events surrounding the alleged assault in multiple ways, but did not waver in her core testimony that Defendant had touched her inside her vagina.

The jury returned guilty verdicts on both charges on 11 June 2009 and Defendant was sentenced to consecutive active sentences of 288-315 months for first-degree sex offense and 19-23 months for taking indecent liberties with a child. Defendant appealed. Subsequent to the filing of Defendant's notice of appeal, the trial court modified Defendant's sentence for first-degree sex offense to 288-355 months because the original sentence for this charge did not fall within the guidelines of N.C. Gen. Stat. § 15A-1340.17 (2009). Additional relevant facts will be discussed in the body of the opinion.

I.

We find Defendant's first argument dispositive. Defendant argues that the trial court committed prejudicial error by admitting evidence that Defendant had sexually assaulted a four-year-old boy eighteen years before the alleged sexual assault in this case. We agree.

The State called as a witness Elizabeth Carroll (Carroll), a retired investigator from the Sheriff's Department of York County, South Carolina. Pursuant to Rule 404(b) of the North Carolina Rules of Evidence, the State sought to admit, through Carroll, evidence that Defendant had "admitted responsibility for conducting lewd or sexual acts with [a four-year-old boy]" in April of 1990. This evidence was supported by records from South Carolina showing that Defendant had been convicted of "assault & battery, high & aggravated nature" in December of 1990. After a *voir dire* of Carroll, and over Defendant's objection, the trial court allowed the State to present Carroll's testimony for the purposes of proving identity, intent, and a common scheme or plan.

In *State v. Carpenter*, 361 N.C. 382, 646 S.E.2d 105 (2007), our Supreme Court reviewed the law governing the admission of evidence of prior crimes or bad acts pursuant to Rule 404(b). In *Carpenter*, our Supreme Court held that evidence of a 1996 conviction for selling cocaine was improperly admitted in a defendant's trial where the defendant had been charged in 2004 with possession of cocaine with intent to sell. The Court further held that the improper admission of the prior conviction was prejudicial, and ordered a new trial. *Id.* The Court in *Carpenter* began with a thorough analysis of Rule 404(b):

North Carolina Rule of Evidence 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

We have characterized Rule 404(b) as a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54

(1990). However, we have also observed that Rule 404(b) is "consistent with North Carolina practice prior to [the Rule's] enactment." *State v. DeLeonardo*, 315 N.C. 762, 770, 340 S.E.2d 350, 356 (1986); *accord State v. McKoy*, 317 N.C. 519, 525, 347 S.E.2d 374, 378 (1986). Before the enactment of Rule 404(b), North Carolina courts followed "[t]he general rule . . . that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense. This is true even though the other offense is of the same nature as the crime charged." *State v. McClain*, 240 N.C. 171, 173, 81 S.E.2d 364, 365 (1954) (citations omitted); *see also DeLeonardo*, 315 N.C. at 769, 340 S.E.2d at 355 ("Since *State v. McClain* . . . it has been accepted as an established principle in North Carolina that 'the State may not offer proof of another crime independent of and distinct from the crime for which defendant is being prosecuted even though the separate offense is of the same nature as the charged crime.' "). As we explained in *McClain*, the general rule "rests on these cogent reasons":

(1) Logically, the commission of an independent offense is not proof in itself of the commission of another crime.

(2) Evidence of the commission by the accused of crimes unconnected with that for which he is being tried, when offered by the State in chief, violates the rule which forbids the State initially to attack the character of the accused, and also the rule that bad character may not be proved by particular acts, and is, therefore, inadmissible for that purpose.

(3) Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the prisoner guilty, and thus effectually to strip him of the presumption of innocence.

(4) Furthermore, it is clear that evidence of other crimes compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the charge immediately before it. The rule may be said to be an application of the principle that the evidence must be confined to the point in issue in the case on trial.

240 N.C. at 173-74, 81 S.E.2d at 365-66 (citations and quotation marks omitted); *see also McKoy*, 317 N.C. at 526, 347 S.E.2d at 378. Thus, while we have interpreted Rule 404(b) broadly, we have also long acknowledged that evidence of prior convictions must be carefully evaluated by the trial court.

Accordingly, we have observed that evidence admitted under Rule 404(b) "should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused." *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 122 (2002). When evidence of a prior crime is introduced, the " 'natural and inevitable tendency' " for a judge or jury " 'is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.' " *Id.* at 154, 567 S.E.2d at 122-23 (quoting IA John Henry Wigmore, *Evidence* § 58.2, at 1212 (Peter Tillers ed., 1983)). Indeed, "[t]he dangerous tendency of [Rule 404(b)] evidence to mislead and raise a legally spurious presumption of guilt requires that its admissibility should be subjected to strict scrutiny by the courts." *State v. Johnson*, 317 N.C. 417, 430, 347 S.E.2d 7, 15 (1986).

In light of the perils inherent in introducing prior crimes under Rule 404(b), several constraints have been placed on the admission of such evidence. Our Rules of Evidence require that in order for the prior crime to be admissible, it must be relevant to the currently alleged crime. N.C.G.S. § 8C-1, Rule 401 (2005) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *id.*, Rule 402 (2005) ("Evidence which is not relevant is not admissible."). In addition, "the rule of inclusion described in *Coffey* is constrained by the requirements of similarity and temporal proximity." *Al-Bayyinah*, 356 N.C. at 154, 567 S.E.2d at 123; *see also State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993) ("The admissibility of evidence under [Rule 404(b)] is guided by two further constraints—similarity and temporal proximity."). This Court has stated that "remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admis-

sibility." *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991). Nevertheless, we note that the two offenses in the case at bar are separated by eight years. Moreover, as to the "similarity" component, evidence of a prior bad act must constitute " 'substantial evidence tending to support a reasonable finding by the jury that the defendant committed [a] *similar* act.' " *Al-Bayyinah*, 356 N.C. at 155, 567 S.E.2d at 123. "Under Rule 404(b) a prior act or crime is 'similar' if there are 'some unusual facts present in both crimes . . . .' " Finally, if the propounder of the evidence is able to establish that a prior bad act is both relevant and meets the requirements of Rule 404(b), the trial court must balance the danger of undue prejudice against the probative value of the evidence, pursuant to Rule 403.

*Carpenter*, 361 N.C. at 386-89, 646 S.E.2d at 109-10 (some internal citations omitted).

We note that our Supreme Court in *Carpenter* quotes *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991), for the "statement" that "remoteness in time generally affects only the weight to be given [the] evidence, not its admissibility." Yet, the Court in *Carpenter* goes on to highlight the eight-year gap between the two offenses in a manner suggesting that, in its admissibility analysis, the Court was weighing remoteness in time. *Id.* A review of the appellate cases of our State reveals confusion surrounding whether the temporal prong of the test for admissibility still applies, and, if it does, the weight to be given the temporal prong when determining admissibility of prior bad act evidence pursuant to Rule 404(b).

We find that a thorough review of our Supreme Court's decisions supports considering the length of time between offenses when determining whether to *admit* at trial prior bad act evidence pursuant to Rule 404(b). *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *vacated and remanded on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990) ("The use of evidence as permitted under Rule 404(b) is guided by two constraints: similarity and temporal proximity. When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value. When otherwise similar offenses are distanced by significant stretches of time, commonalities become less striking, and the probative value of the analogy attaches less to the acts than to the character of the actor.") (citations omitted); *State v. Jones*, 322 N.C. 585, 589, 369 S.E.2d 822, 824 (1988) ("Moreover, evidence of

STATE v. GRAY

[210 N.C. App. 493 (2011)]

other crimes may distract the fact finders and confuse their consideration of the issues at trial. With these considerations bearing great weight, this Court has required that evidence of prior bad acts, admitted to show a common plan under Rule 404(b), be 'sufficiently similar and not so remote in time' before they can be admitted against a defendant.") (citations omitted); *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988) ("Nevertheless, the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403. *State v. Cotton*, 318 N.C. 663, 665, 351 S.E.2d 277, 278-79 (1987).").

However, in *Stager* our Supreme Court stated:

> Remoteness in time between an uncharged crime and a charged crime is more significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan. *Riddick*, 316 N.C. at 134, 340 S.E.2d at 427. In contrast, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility. *See Smoak*, 213 N.C. at 93, 195 S.E. at 81.

*Stager*, 329 N.C. at 307, 406 S.E.2d at 893. It appears the *Stager* Court supports its statement that, "*[i]n contrast*, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident[,]" *id.* (emphasis added), solely by way of comparison to the language in *Riddick*, which merely states that remoteness in time is *more* significant when the evidence sought to be admitted is for the purpose of showing a common scheme or plan. *Riddick* does not suggest any *diminished* significance in the remoteness in time inquiry for admission of prior bad act evidence for purposes other than showing a common scheme or plan. Thus, the lesser significance of remoteness in time attached to evidence of intent, *et cetera*, is only *relative* to the greater significance of remoteness in time with respect to evidence of a common scheme or plan. In *Stager*, the language concerning the importance of remoteness in making admissibility determinations for evidence related to intent, *et cetera*, does not serve to diminish the significance of the remoteness analysis with respect to this kind of evidence below any pre-*Stager* standard.

The Court in *Stager* cites *State v. Smoak*, 213 N.C. 79, 93, 195 S.E. 72, 81 (1938), in support of its statement that "remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Stager*, 329 N.C. at 307, 406 S.E.2d at 893. The Court in *Smoak*, before the adoption of the North Carolina Rules of Evidence, reviewed the law relevant to admission of evidence of alleged prior offenses:

> "Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant's guilt of the crime charged. . . . The question is one of induction, and the larger the number of consistent facts the more complete the induction. . . . Like crimes committed against the same class of persons, *at about the same time*, tend to show the same general design, and evidence of the same is relevant and may lead to proof of identity."
>
> . . . "Another exception to the general rule is that evidence of other crimes of the same general character is admissible when it tends to prove, plan, system, habit, or scheme of related offenses, or a design to commit a series of like crimes. . . .
>
> "It is undoubtedly the general rule of law, with some exceptions, that evidence of a distinct substantive offense is inadmissible to prove another and independent crime, the two being wholly disconnected and in no way related to each other. But to this there is the exception, as well established as the rule itself, that proof of the commission of other like offenses is competent to show the *quo animo*, intent, design, guilty knowledge, or scienter, when such crimes are so connected with the offense charged as to throw light upon this question. Proof of other like offenses is also competent to show the identity of the person charged with the crime.

*Smoak*, 213 N.C. at 90-91, 195 S.E. at 79-80 (emphasis added) (internal citations omitted).

In *Smoak*, the defendant was on trial for the 1936 strychnine poisoning death of his daughter, Annie Smoak. At trial, over the defendant's objection, evidence was presented that tended to implicate the defendant in the strychnine poisonings of three other individuals who died, two of whom were the defendant's first and second wives. The defendant's first wife, Georgia Smoak, died in 1922; his second

wife, Alice Smoak, died in 1935. The third woman, Bertha Stewart, seems to have been poisoned in 1935, though the opinion is not entirely clear on this point. The defendant was the beneficiary of life insurance policies on all three of these women. The defendant had also taken out life insurance policies on his daughter prior to her poisoning death. The defendant was never tried for the earlier alleged poisonings. However, evidence of these suspected poisonings was admitted at trial, including results from an autopsy performed on Georgia Smoak's exhumed body, which discovered fatal quantities of strychnine. An autopsy of the defendant's daughter also discovered fatal levels of strychnine. *Smoak*, 213 N.C. 79, 195 S.E. 72. In *Smoak*, our Supreme Court looked to other jurisdictions to inform its decision in holding that the evidence of prior poisonings was admissible for certain limited purposes:

> The admissibility of evidence of previous poisonings to show motive and *scienter* is most clearly brought out by the case of *People v. Gosden*, 56 P.2d 211 (Calif., 1936). The defendant had taken out insurance on a first and second wife. Both had died from strychnine poisoning. He was tried for the death of his second wife, and at the trial objected to introduction of evidence showing the similarity of the circumstances surrounding the death of his first wife. In upholding the admissibility of the evidence, the California Court said: "This evidence tended to show that each died of strychnine poisoning, each was insured with the appellant as the beneficiary, and in each case the appellant attempted immediately upon the death of the wife to collect the insurance upon her life. The evidence as to the death of the first wife and the fact that her life was insured with the appellant as beneficiary was properly admitted to show *motive* of the appellant in the murder of his second wife. It was also admissible to show *knowledge on the part of the appellant as to the effect of administering strychnine to a human being*."

*Smoak*, 213 N.C. at 91, 195 S.E. at 80 (internal citations omitted) (emphasis added). Our Supreme Court then cited cases where similar evidence was admitted "to show criminal intent[.]" *Id.* at 92, 195 S.E. at 80 (citations omitted). However, our review of *Smoak* fails to uncover any support in that opinion for the statement concerning prior bad act evidence that "remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Stager*, 329 N.C. at 307, 406 S.E.2d at 893.

The Court in *Smoak* clearly laid out the similarities between the evidence of the prior poisonings and the poisoning murder of the defendant's daughter, for which he was on trial. The evidence suggested that the defendant began a series of strychnine poisonings with his first wife, Georgia Smoak, in 1922, in order to collect life insurance benefits from policies the defendant had taken out with himself as beneficiary. Though the poisoning of Georgia Smoak occurred some fourteen years prior to the poisoning death of the defendant's daughter, in light of the undeniable similarities between the facts surrounding the two poisoning deaths and the two intervening poisonings, also remarkably similar to the first and last, our Supreme Court held: "The other like offenses were to show the *scienter*, intent, and motive of defendant. *On this record* they are so connected or associated that this evidence would throw light upon the question of his guilt." *Smoak*, 213 N.C. at 90, 195 S.E. at 79 (emphasis added).

Referring specifically to evidence of the earliest alleged poisoning, the Court in *Smoak* stated: "The evidence in regard to the defendant's first wife, Georgia Jones Smoak, was remote, but, *linked in with the other evidence*, we think it was a circumstance to be considered by the jury." *Smoak*, 213 N.C. at 93, 195 S.E. at 81 (emphasis added). This quote is apparently the one upon which the *Stager* Court relied for the statement that remoteness in time is generally not a factor to consider when determining the *admissibility* of evidence of prior bad acts. When read in context, the clear meaning of this quote from *Smoak* is that, though the evidence concerning Georgia Smoak was remote in time, when considered in light of the similarities between that evidence and the murder of the defendant's daughter, and the evidence of an ongoing *pattern* of similar poisonings perpetrated for financial gain, the trial court did not err in admitting the evidence. Due to the striking similarities between the prior bad act evidence and the crime charged, and the pattern established by that evidence, allowing the jury to consider evidence of Georgia Smoak's poisoning did not constitute error. This quote does not suggest that remoteness in time should not be a factor when determining whether to admit the evidence in the first instance. The Court in *Smoak* clearly did consider remoteness in time in its admissibility analysis, but found that remoteness was outweighed by other factors.

That *Smoak* did not serve to remove remoteness in time from the admissibility analysis is supported by opinions from our Supreme Court, following *Smoak*, that have held that evidence of prior bad acts should have been excluded due to the remoteness in time

between the alleged commission of those prior bad acts and the charges for which those defendants were then being tried.

> In *State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982), this Court held it was error for the trial court to permit a witness to testify to evidence of prior crimes committed by the defendant *because the period of time separating the crimes, a period of seven months, lessened the probative force of that evidence.* The Court in *Shane* stated that "it is evident that *the period of time elapsing between the separate sexual events plays an important part in the balancing process,* especially when the State offers the evidence of like misconduct to show the existence of a common plan or design for defendant's perpetration of this sort of crime." *Id.* at 654, 285 S.E. 2d at 820.

*Jones*, 322 N.C. at 589-90, 369 S.E.2d at 824 (emphasis added) (footnote omitted). Our Supreme Court has acknowledged the ongoing relevance of the remoteness analysis in determining whether 404(b) evidence is admissible, even after *Stager*. *See State v. Badgett*, 361 N.C. 234, 243-44, 644 S.E.2d 206, 212 (2007); *State v. Al-Bayyinah*, 356 N.C. 150, 154-55, 567 S.E.2d 120, 123 (2002); *State v. Frazier*, 344 N.C. 611, 615-16, 476 S.E.2d 297, 299-300 (1996); *State v. Penland*, 343 N.C. 634, 653-54, 472 S.E.2d 734, 745 (1996); *State v. White*, 331 N.C. 604, 615-16, 419 S.E.2d 557, 564 (1992).

Perhaps most relevantly, in *Jones*, our Supreme Court was asked to address the precise issue of whether remoteness in time should be a factor in the decision to admit or deny admission of prior bad act evidence. *Jones*, 322 N.C. at 590-91, 369 S.E.2d at 825. In *Jones*, our Supreme Court expressly rejected the State's request to limit the temporal prong of the 404(b) admissibility test to the weight to be given the evidence, and to not consider that prong when deciding admissibility:

> Similarly, the time period between the alleged prior acts of defendant and the acts upon which this appeal is based is of such a span that any similarity between the two acts is severely attenuated. The period of seven years "substantially negate[s] the plausibility of the existence of an ongoing and continuous plan to engage persistently in such deviant activities." As such, the reasoning that gave birth to Rule 404(b) exceptions is lost. *See State v. Scott*, 318 N.C. 237, 347 S.E. 2d 414 (1986) (nine-year period held to be too remote to be probative or relevant).

Evidence of other crimes *must be connected by point of time and circumstance.* Through this commonality, proof of one act may reasonably prove a second. However, *the passage of time between the commission of the two acts slowly erodes the commonality* between them. The probability of an ongoing plan or scheme then becomes tenuous. Admission of other crimes at that point allows the jury to convict defendant because of the kind of person he is, rather than because the evidence discloses, beyond a reasonable doubt, that he committed the offense charged.

The *State argues that remoteness of time should go to the weight and credibility to be given this type of evidence and not to its admissibility.* The State directs this Court to *Cooper v. State,* 173 Ga. App. 254, 325 S.E. 2d 877 (1985), where a Georgia court held that the lapse of time between prior occurrences and the offenses charged goes only to the weight and credibility of such testimony and would not prevent its admissibility. *Our cases, however, are to the contrary,* and we support their reasoned conclusion that *the passage of time must play an integral part in the balancing process to determine admissibility* of such evidence. *See State v. Boyd,* 321 N.C. 574, 364 S.E. 2d 118; *State v. Cotton,* 318 N.C. 663, 351 S.E. 2d 277 (1987); *State v. Weaver,* 318 N.C. 400, 348 S.E. 2d 791 (1986).

It seems incongruous that such testimony should be allowed into evidence when its probative impact has been so attenuated by time that it has become little more than character evidence illustrating the predisposition of the accused. Such is proscribed by Rules 403 and 404 of our rules of evidence. *We think that a process that allows for the passage of time to be weighed in a court's initial decision to admit such evidence is the better reasoned approach* and one that ensures that an accused is tried only for the acts for which he has been indicted. *We therefore decline to follow Cooper v. State,* 173 Ga. App. 254, 325 S.E. 2d 877.

*Jones,* 322 N.C. at 590-91, 369 S.E.2d at 824-25 (emphasis added).

Our Supreme Court has not overruled *Jones,* and we believe we are still bound by the holding in *Jones.* Our Supreme Court has continued to cite *Jones* for this proposition. *Frazier,* 344 N.C. at 615, 476 S.E.2d at 300; *White,* 331 N.C. at 616, 419 S.E.2d at 564; *Artis,* 325 N.C. at 300, 384 S.E.2d at 482 ("Attenuated by time, the pertinence of evidence of prior offenses attaches to the defendant's character rather than to the offense for which he is on trial. In other words, remote-

ness in time tends to diminish the probative value of the evidence and enhance its tendency to prejudice."); *State v. Shamsid-Deen*, 324 N.C. 437, 444-45, 379 S.E.2d 842, 847 (1989). We are also bound by our Supreme Court opinions, some mentioned above, which were filed after *Smoak*, *Jones*, or *Stager*, that continue to consider remoteness in time between bad acts when evaluating the *admissibility* of evidence pursuant to Rule 404(b). Furthermore, as our Supreme Court in *Carpenter* acknowledged, the language from *Stager* constituted a statement, not a holding. *Carpenter*, 361 N.C. at 388, 646 S.E.2d at 110 ("This Court has stated that 'remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility.' *Stager*, 329 N.C. at 307, 406 S.E.2d at 893. Nevertheless, we note that the two offenses in the case at bar are separated by eight years."). Because this quote from *Stager* was not necessary to the decision reached by our Supreme Court in *Stager*, it constitutes *obiter dictum*. *Trustees of Rowan Tech. v. Hammond Assoc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) ("Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby.") (citations omitted). In *Jones*, however, our Supreme Court made a definite holding rejecting the proposition that remoteness in time was a factor to be considered only for the weight to be given the evidence, not the admissibility of that evidence. *Jones*, 322 N.C. at 590-91, 369 S.E.2d at 824-25.

We acknowledge another line of cases originating in this Court with *State v. Hall*, 85 N.C. App. 447, 451, 355 S.E.2d 250, 253 (1987), which interpreted *State v. Brown*, 280 N.C. 588, 187 S.E.2d 85 (1972), to stand for the proposition that, pursuant to Rule 404(b), remoteness usually goes to the weight of the evidence and not its admissibility. In *Brown*, our Supreme Court stated that

> [A police officer] testified that five days after these crimes he found a cartridge near the door of the bedroom where the rapes took place, and this was the cartridge later identified by the expert as the one having been ejected from [a defendant's] rifle. Defendants contend that the identification of the cartridge found on February 17 should not have been admitted because of remoteness. The five-day lapse occurring between the crimes and the discovery of the cartridge is not a significantly long period. This lapse of time would not render the evidence incompetent, but would only affect the probative force of the evidence.

*Id.* at 596, 187 S.E.2d at 91. The relevant language in *Brown* has nothing to do with Rule 404(b) or the admission of prior bad act evidence. Furthermore, the *Brown* Court held that the lapse in time was not "significantly long"—a only five days—and, therefore, "would not render the evidence incompetent[.]" *Id.* In *Brown*, our Supreme Court conducted a remoteness analysis, and it simply determined the five-day time period did not render the evidence too remote. In light of the conflict between *Hall* and *Jones*, we are bound by *Jones*.

II.

Nonetheless, it is clear that there are no bright line rules when considering the remoteness prong of the Rule 404(b) admissibility test. For example, when the evidence challenged by a defendant suggests an ongoing and repetitive course of conduct by that defendant, a longer period of time in which the defendant has allegedly been *continuing* the similar conduct tends to make the evidence more relevant, not less, for proving a common scheme or plan. *State v. Frazier*, 344 N.C. 611, 616, 476 S.E.2d 297, 300 (1996) ("Here, the testimony in question tended to prove that defendant's prior acts of sexual abuse occurred continuously over a period of approximately twenty-six years and in a strikingly similar pattern. All of the victims were adolescents at the time defendant began his sexual assaults. In each instance, defendant slowly began touching the victim and gradually reached more serious abuse culminating in intercourse. During the period of the abuse, defendant bought his victims gifts and gave them money. He also threatened each of them that if she revealed to anyone what he was doing, she would be sent away or suffer some other severe sanction. All of the victims were related to defendant, either through his own marriage or the marriages of his children, and all lived with or near defendant during the course of the abuse. We conclude that this evidence presents a classic example of a common plan or scheme. 'When similar acts have been performed continuously over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan.' *Shamsid-Deen*, 324 N.C. at 445, 379 S.E.2d at 847."). Certain occurrences, such as imprisonment, may toll the length of time for remoteness purposes, if the defendant has been involuntarily prevented from continuing to engage in the relevant conduct. *State v. Jacob*, 113 N.C. App. 605, 607-12, 439 S.E.2d 812, 813-16 (1994). Furthermore, the more striking the similarities between the facts of the crime charged and the facts of the prior bad act, the longer evidence of the prior bad act remains relevant and potentially admissible for certain purposes.

Remoteness in time is less important when the other crime is admitted because its *modus operandi* is so strikingly similar to the *modus operandi* of the crime being tried as to permit a reasonable inference that the same person committed both crimes. It is reasonable to think that a criminal who has adopted a particular *modus operandi* will continue to use it notwithstanding a long lapse of time between crimes. It is this latter theory which sustains the evidence's admission in this case.

*State v. Riddick*, 316 N.C. 127, 134, 340 S.E.2d 422, 427 (1986).

In the present case, the trial court instructed the jury that it could consider the fact of Defendant's prior conviction .

solely for the purpose of showing the identity of the person who committed the crime charged in this case; that the person charged in this case had the intent, which is a necessary element of the crime charged in this case; that there existed in the mind of [Defendant] in this case a plan or design involving crimes charged in this case.

### III.

Rule 404(b) evidence is admissible to prove identity when the defendant is not definitely identified as the perpetrator of the alleged crime. *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983) (citation omitted); *see also State v. Tuggle*, 284 N.C. 515, 521, 201 S.E.2d 884, 888 (1974) (evidence of similar crime that occurred less than thirty minutes earlier and less than four miles away admissible for purposes of identity as "evidence as to *what happened* [during the commission of the crime] was not contradicted. The primary issue was whether *defendant* committed these crimes."). In the present case, Defendant was identified by the child as the perpetrator, assuming a crime was committed. The child testified that Defendant, and only Defendant, improperly touched her inside her vagina. The primary issue in this case is what, if anything, happened, not who was responsible if a crime was, in fact, committed.

Assuming, *arguendo*, that the defendant was not definitely identified as the perpetrator of the crime charged, the circumstances of the two crimes must still be such as to "tend to show that the crime charged and another offense were committed by the same person" before the evidence will be admissible. Therefore, before this exception can be applied, there must be shown some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes. To

allow the admission of evidence of other crimes without such a showing of similarities would defeat the purpose of the general rule of exclusion.

*Id.* at 106-07, 305 S.E.2d at 545 (internal citations omitted).

Following his South Carolina conviction for "assault and battery of a high and aggravated nature[,]" Defendant was incarcerated in December 1990. The underlying offense occurred in April 1990. There was no evidence presented at the hearing that established how long Defendant remained incarcerated. Evidence was presented that showed Defendant was sentenced to eight years of imprisonment. However, no evidence was presented that showed how much of that sentence Defendant actually served. The trial court stated, "I can only, I guess, assume by what's before me that [Defendant] served eight years. So if I—if one concluded that, then we're talking about 12 years instead of 20 years." The trial court, therefore, made no finding of fact concerning how long Defendant was incarcerated for the 1990 conviction. We hold that, absent competent evidence concerning the length of Defendant's incarceration, the prior act must be considered without tolling for the time Defendant spent in prison.

"Evidence that a defendant engaged in previous sexual abuse is inadmissible when a significant lapse of time exists between the instances of alleged sexual abuse." *State v. Delsanto*, 172 N.C. App. 42, 50, 615 S.E.2d 870, 875 (2005) (citation omitted) (evidence that the defendant had sexually molested his four-year-old niece twenty-three years earlier too remote for admission to show a common scheme or plan in trial where the defendant was accused of sexually molesting his three-year-old granddaughter).

In the present case, the trial court made the following ruling concerning the evidence at issue:

And taking [the *Carpenter*] approach as to the evidence in this case, I do note the similarity of the settings; the similarity of the relationships among the folks involved—that is, relatives, friends of the victim having relationships, friendship or other relationships with those same individuals and the—and the child; the manner of previous relationship between the perpetrator and the victim regarding the aura of trust that defendant proceeded to feel with the victim; and the manner of the approach and execution of the specific offense—note that both are sexual offenses; distinct differences in the objects and the purposes involved in

each, but the tender age of each child engaged with the defendant is a similarity of, the [c]ourt's opinion, overwhelming proportions, and the [c]ourt finds that even considering the strict phrases of *State versus Carpenter* and the [c]ourt noting the dangerous tendency to mislead, the court finds this evidence to be strongly relevant and probative and not outweighed by the danger of unfair prejudice to the defendant pursuant to 403 consideration.

The South Carolina offense occurred in April of 1990 and the offense in the present case allegedly occurred in August 2008, nearly eighteen and one-half years later. Assuming *arguendo*, there was evidence to support a finding that Defendant spent eight years in prison for the 1990 conviction, there would remain over ten years between his release and the alleged commission of the crimes from which he appeals. Because there was no evidence of an ongoing pattern of crimes between the 1990 offense and the present case, but rather only the single prior conviction for an offense over eighteen years old, remoteness in time becomes more significant in the analysis for admission for the purpose of showing a common scheme or plan. *Riddick*, 316 N.C. at 134, 340 S.E.2d at 427; *see also Frazier*, 344 N.C. at 616, 476 S.E.2d at 300.

We next look to the similarities and differences between the acts underlying the 1990 conviction and the alleged acts in the case before us. Carroll was an investigator for the York County South Carolina Sheriff's Office in 1990, and investigated the incident in question. According to Carroll's report, and her affidavit in support of an arrest warrant, the four-year-old victim, a boy, was spending the night at his babysitter's house when the assault occurred. According to the victim's mother, Defendant would visit the babysitter's house "on different occasions while [the victim] was there." The victim told Carroll that Defendant engaged in anal intercourse with the victim while the victim was in bed. Carroll testified at the suppression hearing that the victim stated that he "had slept in the bed with [Defendant] on several different occasions during the time when [the victim was at the babysitter's house] and that he—he had woken one night and [Defendant] was on top of him with his penis in his [anus]." Defendant was a cousin to the husband of the babysitter and, at the time, Defendant was thirty-five years of age.

In the case before us, the child was a five-year-old girl at the time of the alleged assault. Testimony given at trial at the suppression hearing included the following. The child testified that she was spending the night at her grandparents' house on the night of the

assault. The child's uncle lived at the grandparents' house. The child testified that Defendant sometimes visited her uncle when she was spending the night at her grandparents' house. The child's uncle testified that Defendant was a friend; that he and Defendant spent a lot of time together visiting Defendant's family, going to stores and restaurants, and spending time at Defendant's house and the grandparents' house. The uncle testified that the child was sometimes at the grandparents' house when Defendant would come to visit the uncle. The uncle further testified that Defendant would give the child candy and then hug her in an inappropriate manner. The child also testified that Defendant gave her candy. However, the child testified that Defendant gave her uncle candy, too, and that Defendant didn't ask her to do anything in return for the candy. The child testified that she just thanked Defendant for the candy. The child further testified that Defendant touched her vagina with his finger but never touched her inappropriately with any other part of his body.

The child's mother testified that one day when she stopped by the grandparents' house to see the child, she saw Defendant and the child in a bedroom. The child was

lying across the bed and [the mother] saw her like kick a leg. I couldn't actually see [Defendant] until I came around the corner; then that's when he jumped back. . . . . I couldn't see if he was standing or what. All I know is I saw him jump back and I saw her like kick her leg and I came around the corner . . . . And that's all I saw.

The mother later asked the child what had happened in the room, and the child stated that Defendant "stuck his finger in her." The child also told her mother that she was "stinging" in her vaginal area. The mother saved the child's clothes and turned them over to the police, unwashed. The mother took the child to the doctor the next day.

The main relevant similarity between the 1990 offense, and the facts presented to the trial court in the present case, is that both children involved were quite young—four and five years of age—at the time the acts allegedly occurred. Another similarity is that both alleged acts occurred at a caretaker's house where Defendant was a reasonably frequent visitor.

The main differences between the two alleged assaults involve the nature of the alleged assaults. In the 1990 incident, Defendant was accused of forcing anal intercourse on a boy while the boy was sleep-

ing. This would have necessitated at least partial removal of the boy's clothes and Defendant's clothes. Defendant apparently slept in the same bed with the boy multiple times before this incident occurred. In the present case, Defendant was accused of inserting his finger in the vagina of a girl. This occurred during daylight hours, and neither the child's clothes nor Defendant's clothes were removed. The child testified that Defendant never touched her with any part of his body other than his hand. There was no evidence that Defendant ever spent the night with the child. In the 1990 case, Defendant was a cousin of the babysitter's husband. In the present case, Defendant was not related to anyone in the house where the alleged assault occurred. Defendant gave candy to the child in the present case, but there was no evidence of gift-giving to the boy in the 1990 case. Defendant was thirty-five years old in 1990, and fifty-three years old when the assault in the present case allegedly occurred. There was no evidence presented that Defendant had committed any acts of assault against anyone in the intervening years.

The similarities show little more than that the alleged perpetrator of both acts was attracted to young children, and that he used the fact that he was a welcome guest in the house where each child was staying to find time alone with that child in order to commit the assaults. These facts are all too common in cases involving sexual assaults on minors by an adult. "[A]s to the 'similarity' component, evidence of a prior bad act must constitute ' " 'substantial evidence tending to support a reasonable finding by the jury that the defendant committed [a] *similar* act.' "' *Al-Bayyinah*, 356 N.C. at 155, 567 S.E.2d at 123." *Carpenter*, 361 N.C. at 388, 646 S.E.2d at 110.

> While it is true that "North Carolina courts have been consistently liberal in admitting evidence of similar sex offenses in trials .on sexual crime charges[,]" when two or three decades have passed between the incidents, certainly the Court must require more similarity between the acts than what was provided herein—namely, that the victims were young girls in defendant's care, the incidents happened in his home, and he told the girls not to report his behavior. While "the similarities between the two incidents need not be unique and bizarre[,] . . . the similarities simply must tend to support a *reasonable* inference that the same person committed both the earlier and later acts." Such is not the case here. Admission of this testimony was, therefore, error.

*State v. Webb*, 197 N.C. App. 619, 623, 682 S.E.2d 393, 395-96 (2009) (internal citations omitted) ("the trial court erred in allowing the tes-

timony of two witnesses who alleged that defendant had abused them twenty-one and thirty-one years prior"); *see also State v. White*, 135 N.C. App. 349, 353, 520 S.E.2d 70, 73 (1999) ("Except for the fact that both incidents involve young females who were allegedly assaulted in their own homes, there are few points of similarity.").

In the present case, in light of the dissimilarities between the two alleged acts and the great length of time between them, we hold that the State has failed to show sufficient "unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes." *Moore*, 309 N.C. at 106, 305 S.E.2d at 545, *see also Al-Bayyinah*, 356 N.C. at 155-56, 567 S.E.2d at 123; *Jones*, 322 N.C. at 590, 369 S.E.2d at 825; *Moore*, 309 N.C. at 106-08, 305 S.E.2d at 545-46 (our Supreme Court held evidence of a prior attack should have been excluded because the prior attack was insufficiently similar, included distinct dissimilarities, and was somewhat remote in time and place (though the two attacks both occurred in Greensboro and within two months of each other)); *Delsanto*, 172 N.C. App. at 50-52, 615 S.E.2d at 875-76. Evidence related to Defendant's 1990 sexual assault on the four-year-old boy was improperly admitted pursuant to Rule 404(b) for the purposes of identity.

IV.

We reach the same holding for admission of the 1990 evidence for the purposes of showing a common scheme or plan or proving intent. In light of the fact that only a single prior act was introduced, and the fact that it was very remote in time and lacking in unusual shared facts, the evidence of the 1990 assault was not admissible to show a common scheme or plan. In *Jones*, the trial court found the following similarities between alleged sexual assaults against the victim and another State's witness (State's witness):

1. That the State has introduced evidence tending to show that the defendant, Charlie James Jones, was living in the same home as [the victim] during the relevant periods . . . . That the defendant during previous periods lived in the home with [State's witness].

2. That while the defendant was living in the home with [the victim] she was 12, 13 and 14-years-old. While he lived in the home with [State's witness] she was 11, 12, and 13-years-old.

3. That in both homes the defendant was an adult male in a position of authority when the girls . . . were 11, 12, and 13.

4. That the defendant had vaginal intercourse with both [the victim] and [State's witness] in the afternoons and at night.

5. That in both instances the defendant was throughout those periods having normal sexual relations with adult women—during the episode with [the victim], with his wife . . .; and during the episode with [State's witness], with her sister . . . .

6. That in both cases the defendant used hand guns to physically threaten the girls to force submission to his sexual advances.

*Jones*, 322 N.C. at 586-87, 369 S.E.2d at 823. In *Jones*, the similarities between the alleged acts against the victim and the alleged acts against [State's witness] were far greater than the similarities present in the case before us. Nonetheless, our Supreme Court reasoned:

The State's own evidence tended to show that the alleged assaults against [State's witness] occurred between the years 1970 and 1975. The crimes for which defendant was indicted occurred between the years 1982 and 1985. Thus, there was a twelve-year lapse of time between the start of the alleged assaultive conduct against [State's witness] by defendant and the start of assaultive behavior against the victim in this case. Furthermore, the time differential between the commencement of the assault against the prosecutrix was seven years after the last of the alleged assaultive episodes against [State's witness]. Such an extreme time lapse raises serious concerns about the probative nature of such evidence.

*Id.* at 589, 369 S.E.2d at 824. Based upon this reasoning, our Supreme Court held

that the admission of the testimony relating to the alleged assaultive conduct against [State's witness] was prejudicial to the defendant's fundamental right to a fair trial on the charges for which he was indicted because the prior acts were too remote in time. Accordingly, defendant is entitled to a [new trial].

*Id.* at 591, 369 S.E.2d at 825; *see also Webb*, 197 N.C. App. at 623, 682 S.E.2d at 395-96; *White*, 135 N.C. App. at 353, 520 S.E.2d at 73.

"Even if offered for a proper purpose under Rule 404(b), evidence of prior 'crimes, wrongs, or acts' must be relevant, and such evidence is not relevant unless it 'reasonably tends to prove a material fact in issue' other than the character of the accused." *State v. Haskins*, 104

N.C. App. 675, 679, 411 S.E.2d 376, 380 (1991) (citation omitted). In the present case, based on the facts upon which the trial court made its ruling, we hold that the evidence of the 1990 assault does not reasonably tend to prove Defendant had the intent to assault the child. The prior act is simply too remote, and too different in character, to be relevant in proving Defendant had the intent to sexually assault the child. *See Webb*, 197 N.C. App. at 623, 682 S.E.2d at 395-96; *White*, 135 N.C. App. at 353, 520 S.E.2d at 73. The similarities relied upon by the trial court in making its ruling are far too generic in light of the dissimilarities involved, *see Al-Bayyinah*, 356 N.C. at 155-56, 567 S.E.2d at 123, and again, the long period of time separating the two alleged assaults greatly diminishes any potential probative value. *See Jones*, 322 N.C. at 590, 369 S.E.2d at 825. " 'It is when the transactions are so connected or contemporaneous as to form a continuing action that evidence of the collateral offense will be heard to prove the *intent* of the offense charged.' " *State v. Gammons*, 258 N.C. 522, 524, 128 S.E.2d 860, 862 (1963), *overruled on other grounds, State v. Hunt*, 283 N.C. 617, 197 S.E.2d 513 (1973) (citation omitted).

## V.

Furthermore, even assuming *arguendo* that the 1990 assault was relevant for some proper purpose under Rule 404(b), we hold that the great danger of prejudice warned of in *State v. McClain*, 240 N.C. 171, 173-74, 81 S.E.2d 364, 365-66 (1954), outweighs whatever minimal relevance this evidence could have had. *See also Jones*, 322 N.C. at 590, 369 S.E.2d at 825 ("It seems incongruous that such testimony should be allowed into evidence when its probative impact has been so attenuated by time that it has become little more than character evidence illustrating the predisposition of the accused. Such is proscribed by Rules 403 and 404 of our rules of evidence."); *compare Jacob*, 113 N.C. App. at 606-12, 439 S.E.2d at 813-16 (because of overwhelming similarities between prior bad acts and the crimes for which the defendant was charged, and in light of the fact that the time period was tolled because the defendant did not have access to the kind of victim he preferred, Rule 404(b) was not violated by admission of evidence of the prior bad acts).

Though we have held that the length of time between the two alleged assaults was not tolled by Defendant's prison sentence following his 1990 conviction—because no evidence was presented concerning how long a sentence Defendant actually served—we would reach the same holdings above whether the time period between the

two alleged assaults is calculated at eighteen years or ten years. Because of the lack of similarities between the alleged assaults and the dissimilarities between them, and the fact that there was no evidence of any ongoing pattern—just evidence of the single 1990 assault—ten years would have eroded any relevance of the 1990 assault to such an extent that it cannot outweigh the prejudice to Defendant.

## VI.

Having determined that the trial court erred in admitting, over Defendant's objection, evidence of the 1990 assault, we must now determine if the admission of that evidence prejudiced Defendant to such an extent as to warrant a new trial. N.C. Gen. Stat. § 15A-1443(a) (2009) (Defendant prejudiced in this instance if there was a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."). When we compare the facts of the present case to those of other cases where the admission of evidence of prior sexual assaults was held prejudicial, we likewise hold that Defendant was prejudiced by the admission of the evidence of the 1990 assault. *See, e.g., Jones*, 322 N.C. at 586-91, 369 S.E.2d at 823-25; *State v. Scott*, 318 N.C. 237, 347 S.E.2d 414 (1986); *Moore*, 309 N.C. at 108, 305 S.E.2d at 546; *State v. Shane*, 304 N.C. 643, 655-56, 285 S.E.2d 813, 821 (1982); *Gammons*, 258 N.C. 522, 128 S.E.2d 860.

"Attenuated by time, the pertinence of evidence of prior offenses attaches to the defendant's character rather than to the offense for which he is on trial. In other words, remoteness in time tends to diminish the probative value of the evidence and enhance its tendency to prejudice." *Artis*, 325 N.C. at 300, 384 S.E.2d at 482. Any probative value of the 1990 evidence is substantially outweighed by the danger of unfair prejudice, namely the "substantial likelihood that the jury w[ould] consider the evidence only for the purpose of determining the defendant's propensity to commit the crimes with which he ha[d] been charged." *State v. White*, 331 N.C. 604, 615-16, 419 S.E.2d 557, 564 (1992) (citation omitted).

We reach this result because the case against Defendant rested almost entirely on the child's testimony, presented at trial by the child herself; and by the testimonies of the mother, Dr. Hayek, and Bullock, relating statements the child had made to them prior to trial. *State v. Couser*, 163 N.C. App. 727, 731-32, 594 S.E.2d 420, 423 (2004) (citations omitted); *see also Webb*, 197 N.C. App. at 620, 682 S.E.2d at 394 ("As is so often true with cases of sexual abuse, the only person able

to testify directly to the events of the abuse was the victim herself."). For this reason, the outcome of this trial rested almost entirely on the credibility of the child, weighed against the credibility of Defendant. "For a jury trial to be fair it is fundamental that the credibility of witnesses must be determined by" the jury. *State v. Holloway*, 82 N.C. App. 586, 587, 347 S.E.2d 72, 73-74 (1986); *see also State v. Horton*, —— N.C. App. ——, ——, 682 S.E.2d 754, 758 (2009). The physical evidence introduced by Dr. Hayek was inconclusive and inconsistent with a theory that the child had been assaulted the day before Dr. Hayek's examination. *Couser*, 163 N.C. App. at 731-32, 594 S.E.2d at 423.

In this case, the child's testimony was inconsistent internally and as presented over time through statements the child made to others who testified at trial. The only physical evidence presented at trial was Dr. Hayek's testimony that the child's hymen showed scarring that could be consistent with the crime with which Defendant was charged. However, Dr. Hayek's testimony was that the injury to the child's hymen had healed, suggesting the injury was at least weeks, and possibly even years, old. The State's theory of the case seems to have been that Defendant sexually assaulted the child on 11 August 2008, the day before Dr. Hayek examined the child. However, the mother testified that it was "probably in June or July" when she caught Defendant in a room with the child. The mother testified that she surprised Defendant in a room with the child and that Defendant acted very suspiciously. The mother asked the child what had happened in the room, and the child said that Defendant had touched her inside her vagina. The mother testified the child told her that "Ralph" was the one who touched her, and the child seemed to "understand who Ralph was [Defendant]." The child testified that she was only touched in that manner one time. Dr. Hayek examined the child the day after this alleged sexual assault. Following this evidence, if the child's testimony was believed, according to Dr. Hayek, Defendant could not have caused the injury to the child's hymen because there would not have been sufficient time for the injury to have healed. Absent this evidence, the only remaining evidence that the child had been sexually assaulted by Defendant was the statements made by the child herself.

At one point in the child's testimony, the trial court stopped the questioning, sent the jury out of the courtroom, and asked the mother to refrain from nodding encouragement to the child's answers. We make no credibility determinations nor do we predict what evidence the jury might find compelling and what evidence the jury might dis-

miss. We must, however, evaluate the potential prejudice of the improperly admitted evidence within the context of the evidence presented at trial. There was no physical evidence that proved an assault had occurred; neither the mother, the uncle, nor the child appeared to remember when the alleged assault occurred; Dr. Hayek's testimony was that, if the injury to the child's hymen was the result of a sexual assault, (and his testimony was that it could have been caused by a sexual assault, but could also have been caused by some other means), it was not evidence of any assault having occurred the day before his examination; and the child's statements to others, and her testimony, contained a number of inconsistencies.

For example, the child was asked if she sometimes did things with her uncle and Defendant, and she answered that she did. When asked what, she testified that they went to see animals together. When asked to clarify if Defendant and her uncle were with her when she went to see the animals, the child answered: "No. It was [the child, her grandparents and her uncle]." When specifically asked if Defendant went with them as well, she answered: "No." She was then asked: "Do you remember anything that y'all three [her, her uncle and Defendant] did together?" The child answered: "The only thing I know, [is] that we went to the thing to see the animals." The child also told Dr. Hayek that Defendant had touched her "cat" while in her uncle's car while her uncle was watching. This contradicts the child's testimony at trial.

Bullock testified that the child was "very, very smart" and that the child knew "all of her family members and . . . could name them. In fact, she could name them faster than I could write." But Dr. Hayek testified that the child couldn't remember Defendant's name when she visited Dr. Hayek the day following the alleged assault, even though Defendant supposedly spent a lot of time with the child. The child introduced the name "Ralph" to Bullock, and referred to the man who she alleged had touched her as "Ralph." The child apparently did not know the name "Ralph" when she spoke with Dr. Hayek the day after the alleged event.

There was testimony from the child that did not seem to fit the State's theory, and which was not supported by additional evidence. For instance, the child told Bullock that Defendant got on top of her and punched her, and the child, using dolls, suggested that Defendant had sexual intercourse with her. The child told Dr. Hayek that Defendant took off his pants and got on top of her and moved his "tail" up and down. The child told Dr. Hayek that her uncle was

watching while the man did this. The child's testimony at trial was that Defendant had his clothes on, and there was no evidence presented that Defendant was unclothed in any way when the mother surprised Defendant in the room with the child on the day in question. The child testified that her uncle was not in the room when Defendant assaulted her. The child also told Bullock that Defendant had kissed her, but she did not tell anyone else that this had happened.

The child told Dr. Hayek that Defendant had touched her inside her bottom as well as inside her vagina. Dr. Hayek testified that he might have seen physical evidence of anal penetration within forty-eight hours of such an incident, but he did not see any evidence of anal penetration when he examined the child the day after the child's mother found the child in the room with Defendant. The child apparently did not tell anyone else she had been touched inside her bottom, and testified at trial that she was only touched inside her vagina and on her elbow. The child's testimony was inconsistent concerning whether Defendant had given her candy, and whether he had asked for "hugs" in return.

The child testified that she had been going to school during the time period that her mother caught Defendant in the bedroom with the child; then the child said that it was summertime and not during the school year. She testified that, on the day in question, her uncle left her alone in a room with Defendant and that Defendant "got on top" of her and then her uncle "came back in and we took a nap." The child then testified that, when her uncle left, Defendant got on top of her but did not do anything while on top of her, and then her mother came into the room. The mother testified that she took the child home directly following this incident. Therefore, the child could not have taken a nap with her uncle.

The child then testified that Defendant had touched her on a different day than when her mother found her in her uncle's room with Defendant. She testified that Defendant had touched her on two different days, and had done different things to her. She then stated that Defendant had only touched her vagina and her elbow. However, the mother testified that the child told her Defendant had been "touching on her" but the first time Defendant "actually stuck his finger in her" was when the mother found the child in the bedroom with Defendant. The child told Dr. Hayek that "the man" had touched her in her "cat" "a lot of times."

A video of Bullock's interview with the child existed, but due to technical difficulties, the jury did not have an opportunity to see the

video. Bullock appeared to be uncertain about some of her interview with the child, as captured on the video, though Bullock had viewed the video shortly before trial. The mother testified that police investigators collected the clothing that the child had been wearing during the alleged incident, and that the mother had not washed the clothing following the incident. However, no further evidence concerning the clothing, or any analysis that might have been done on the clothing, was admitted at trial.

We do not raise these inconsistencies as an attack on the credibility of the child. Testifying at trial is for most people a difficult experience. That difficulty is compounded when the witness is a child, and the testimony concerns alleged sexual abuse. It is the province of the jury to determine credibility and weigh testimony and other evidence. We are obligated to determine whether there is a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a).

## VII.

Our appellate courts have found *plain error* when a sexual assault case has relied primarily on the testimony of the alleged victim in instances when it had been determined that expert testimony that the victim was sexually assaulted had been admitted without a proper foundation. *See Couser*, 163 N.C. App. at 729-32, 594 S.E.2d at 422-24; *see also State v. Giddens*, —— N.C. App. ——, ——, 681 S.E.2d 504, 509 (2009) (plain error where, "as in *Couser*, 'the central issue to be decided by the jury was the credibility of the victim[s].' [The victims] provided detailed and consistent accounts of the sexual abuse they alleged [the defendant] inflicted upon them. . . . The children's testimony was corroborated by the testimony of . . . the Detective Sergeant from Macon County Sheriff's Department, and the child forensic interviewer from Mission Children's Clinic. Although the children's testimony and the corroborating testimony is strong evidence, our prior case law instructs that this alone is insufficient to survive plain error review of the testimony of a witness vouching for the children's credibility."); *State v. O'Connor*, 150 N.C. App. 710, 712, 564 S.E.2d 296, 297, *disc. review denied*, 356 N.C. 173, 567 S.E.2d 144 (2002) (it was plain error to admit expert testimony on the credibility of the victim in a sexual offense case where the State's case was almost entirely dependent on the credibility of the victim and corroboration testimony of others).

**STATE v. GRAY**

[210 N.C. App. 493 (2011)]

In some instances, the improper admission of a prior bad act of a defendant may raise the same concerns as the improper testimony of an expert witness that an alleged victim has been abused—both of these kinds of evidence may lend credibility to an alleged victim's testimony. Improper expert testimony that an assault has occurred obviously bolsters an alleged victim's testimony that she was assaulted. The improper admission of a prior sexual assault by a defendant tends to bolster an alleged victim's testimony that an assault occurred *and* that the defendant was the perpetrator, since such evidence informs the jury that the defendant has committed sexual assault in the past. This evidence further tends to diminish the defendant's credibility, and creates the possibility that the jury will convict the defendant based upon the prior bad act instead of solely on properly admitted evidence. *Jones*, 322 N.C. at 590-91, 369 S.E.2d at 824-25.

VIII.

In this case, Defendant objected to the admission of the evidence of the 1990 assault, so Defendant does not have to meet the plain error standard. On these facts, we hold that there was a reasonable possibility that, had the improper evidence concerning the 1990 sexual assault not been admitted, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a). We must therefore vacate both convictions in this matter and remand for a new trial. Because we remand for a new trial, we do not address Defendant's additional arguments.

New trial.

Judges HUNTER, JR. and BEASLEY concur.