IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-130

Filed 16 May 2023

Ashe County, Nos. 15 CRS 50792-96

STATE OF NORTH CAROLINA

v.

JOSHUA DAVID REBER

Appeal by Defendant from judgments entered 9 August 2021 by Judge Forrest

D. Bridges in Ashe County Superior Court. Heard in the Court of Appeals 19 October

2022.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Margaret A. Force, for the State.*
>
> *Daniel M. Blau, for the Defendant.*

WOOD, Judge.

Joshua Reber ("Defendant") appeals from judgments finding him guilty of

several counts of rape of a child and sex offense with a child. For the reasons stated

herein, we reverse the trial court's judgment and remand for a new trial.

## I. Factual and Procedural Background

In 2009, Defendant and his daughter, Beth[1], moved to North Carolina to live

with his grandparents in Ashe County so Defendant's grandparents could help with

---

[1] Pseudonyms are used here to protect the identity of juveniles.

childcare while Defendant worked. That same year, when Defendant was twenty years old, he became friends with Sherry and Troy, a married couple he knew because they worked together at a group home for individuals with mental disabilities. Defendant became close to the couple and their five children, and he was treated like a member of their family. Because of his close relationship with the family, Defendant and his daughter spent a significant amount of time at Troy and Sherry's home and often spent the night at their home. During their friendship, he and his daughter lived with the family for approximately a month. Troy and Defendant would hunt together, and Troy would bring along his daughter, Khloe, after she turned four years old. Khloe and her sister visited Defendant's grandparents' home a few times to play with Beth, and, on one occasion, the two sisters stayed the night in Beth's room. Khloe also liked to play a video game called Call of Duty with Defendant when she came to Defendant's grandparents' home.

In late September or early October 2015, when Khloe was eleven years old, she told a boyfriend that Defendant had engaged in sexual activities with her and was encouraged by him to report these events to her mother. Khloe then told her mother, Sherry, that Defendant had been "messing with her." In response to Khloe's allegations, Sherry contacted the Ashe County Sheriff Department and filed a report with Captain Carolyn Gentry ("Captain Gentry"). Captain Gentry arranged for Khloe to be interviewed and to have a medical exam.

On 15 October 2015, Detective Graybeal of the Wilkes County Sheriff's

Department, a forensic interviewer at the Safe Spot Child Advocacy Center, interviewed Khloe. During the interview, Khloe stated that the abuse first occurred when she was eight years old while she was alone with Defendant in a deer blind. She reported that one night, after using a spotlight to hunt, Defendant started massaging her, penetrated her vagina with his finger, and later rubbed her chest under her shirt. Khloe also described additional sexual acts that she claimed took place over the next three years, including multiple incidents of vaginal sex, digital penetration, and oral sex with such acts occurring in the deer blind, on her family's couch, in her bedroom, and in the bathroom at her home. Khloe also stated that sexual acts occurred at Defendant's home to include his bedroom, a smoking spot outside, and the woods. Khloe reported to Detective Graybeal that she and Defendant sent nude photos to each other on Snapchat and chatted over Facebook messenger. According to Khloe, the sexual abuse stopped before her eleventh birthday in April 2015. At the child advocacy center, Dr. Suttle conducted a medical exam of Khloe. The medical exam consisted of a head-to-toe assessment and included a genital exam and an anal exam.

On 4 November 2015, Defendant was arrested for several counts of sexual offense with a child and rape of a child. On 19 November 2015, Captain Gentry obtained a search warrant for Defendant's phone. Defendant was indicted on 25 April 2016 on four counts of Rape of a Child in 15 CRS 50792-93 and six counts of Sex Offense with a Child in 15 CRS 50794-96. Defendant was tried before a jury during

the 2 August 2021 criminal session of Ashe County Superior Court with Superior Court Judge Forrest D. Bridges presiding.

During trial, several witnesses testified. Khloe, seventeen years old at the time of trial, testified that she first met Defendant when she was four or five years old and viewed him as a brother with whom she wrestled, hunted, and played videogames. However, Khloe testified that when she reached puberty at age eight, Defendant began to engage in sexual activities with her. She reported that the first incident occurred one evening when she, Defendant, and her father were watching television together in the living room at 3 a.m. Khloe testified that after her father went to bed, Defendant suggested that they move outside to hunt for coyotes, and they entered the deer blind. In the deer blind, Defendant proceeded to massage her chest and buttocks and penetrated her vagina with his finger. Khloe described that she "didn't know how to feel honestly" as she was "scared, nervous, but I had a crush on him before it and, you know, I looked at it like, well, maybe he likes me too, and it's kind of exciting."

According to Khloe, their relationship changed, and she began to view Defendant as a boyfriend, to the point where she did not have "any boyfriends at school." Khloe further testified that when she was between the ages of eight and eleven, the sexual touching occurred at least weekly and took place in the deer blind, the woods located behind her parents' home, her parents' living room, the bathroom, her bedroom, Defendant's bedroom, and outside of his grandparents' home. Khloe

recounted that when she slept over at Defendant's grandparent's home, she would sneak into Defendant's bedroom located on the main level of the home, where they engaged in sexual acts. Khloe testified that she and Defendant played videogames in his bedroom at his grandparent's home, and would wait until everyone left the home, so that "whenever they left, that's when things escalated."

Khloe recounted that on a particular occasion, Defendant's grandmother took Khloe's sister and Beth to church, while Khloe stayed behind with Defendant, so that they "had a little time to [them]selves," which allowed Defendant to "be a little more further with it." Khloe stated that Defendant came over to her parents' home three or four times a week, and at least once a week, they would engage in sexual intercourse in the deer blind. Khloe also alleged that she and Defendant engaged in sexual acts in her family's bathroom, the only bathroom in the home, during the night. She testified Defendant never used a condom during these sexual activities and there were times when Defendant ejaculated into her mouth, into the toilet, or into leftover bottles. Defendant told Khloe not to tell her father about their sexual activities "because he didn't want their relationship to be ruined between them" and not tell anyone else, lest "he would go to prison."

During cross-examination, Khloe testified that, within the two weeks before trial, she watched the interview conducted on 15 October 2015 and explained, "The only reason why I watched the videos is because I didn't remember nothing for six years. So I had to just really remember everything . . . . because this happened so

many times, like the littlest details I probably had done forgot about." When asked about her truthfulness, Khloe stated that she did not need to make up any lies to get attention from her parents.

Khloe's mother, Sherry, also testified that she viewed Defendant as one of her own kids and treated him as part of her family. She stated that all of her children viewed Defendant as a big brother. Sherry testified that she thought Defendant and Khloe had "a brother-sister relationship" before Khloe disclosed the abuse to her. Sherry testified that after Khloe told her about these alleged events, she observed a change in her daughter. Khloe was bullied, depressed, and suicidal and started cutting herself, but Sherry testified that she did not notice any of these behaviors prior to Khloe telling her what had occurred. Sherry also described Khloe as a "normal 8- to 11-year-old" child during the period of these alleged acts. Sherry testified that, in 2010, she quit working and stayed at home "all of the time" to care for the children.

Defendant's grandmother, Mrs. Swann, testified that when Defendant and his daughter moved in with her and her husband, she stopped working to stay home and take care of Beth. Mrs. Swann stated that during the times Khloe came over to her home, her sister was always with her, and Mrs. Swann was home during those visits. During the single time that Khloe and her sister slept over, the three girls slept in Beth's room located in the basement. Mrs. Swann's bedroom was also located in the basement and next to Beth's room. Mrs. Swann testified that, during the relevant

period, their dachshunds, which were normally kept in the basement, barked "if anybody moved down there." Mrs. Swann stated that Khloe was never left home alone with Defendant while the rest of the family went to church, and, in fact, both she and her sister had attended church with Mrs. Swann on the one occasion they slept over. When Khloe and Defendant played video games in his bedroom, Mrs. Swann testified that the door was always open and, from a vantage point in the kitchen, she could clearly see into it. According to Mrs. Swann, she and her husband required doors to be kept open when other children were in their home.

Neither Khloe's mother nor Defendant's grandmother testified to ever having seen any questionable behavior from Defendant or any inappropriate interaction between Defendant and Khloe.

At trial, the State called an expert witness, Ms. Browning of the Safe Spot Child Advocacy Center, to discuss the results of Khloe's 22 October 2015 medical exam, though Ms. Browning was not the medical provider who examined Khloe on 22 October 2015 and had not met her. According to Dr. Suttle's medical report, she did not observe anything specific during the physical exam, which, according to Ms. Brown, would include instances of torn hymenal tissue, evidence of an STD, or pregnancy.

However, Ms. Browning testified that the lack of significant findings during the genital exam does not rule out the possibility of sexual abuse because "it's very few children who have experienced sexual abuse that have any kind of injuries" since

injuries can heal very quickly or there was never an injury there in the first place. Nevertheless, Dr. Suttle's report listed "no physical evidence of sex[ual] abuse found." On cross-examination, Ms. Browning conceded, "In other words, it was an unremarkable or normal exam for a child [Khloe's] age when it was done on October 22, 2015."

Agent Anderson of the SBI testified that he conducted a forensic examination of Defendant's cell phone on 15 March 2016. After reviewing the data extraction, Agent Anderson testified that he did not find evidence of nude photographs having been exchanged between Khloe and Defendant. He also discovered that the phone did not appear to have been activated until May 2015, one month after the alleged abuse had stopped. Agent Anderson found thousands of text messages between Defendant and his girlfriend at that time, Danielle, but no communications between Defendant and Khloe. Agent Anderson testified that he attempted to do a data extraction from Khloe's tablet but was unsuccessful due to technical issues.

The Defense called as a witness Sgt. Lewis, a retired sergeant from the Ashe County Sheriff's Office who assisted Captain Gentry on this case. Sgt. Lewis was assigned to take photographs of Defendant's genital area in order to verify Khloe's claims regarding the location of alleged moles on Defendant's body. Sgt. Lewis testified that he did not observe any evidence of a mole in Defendant's pubic line or on his penis.

At trial, Defendant testified on his own behalf. Defendant testified about his

and his daughter's close relationship with Sherry and Troy and their children, and that he spent quite a bit of time over at their home. He explained that Troy and Sherry's home only had one bathroom. He further testified he was Facebook friends with all of Troy's family who had Facebook accounts, including Khloe and he was first introduced to Call of Duty, a video game, by Troy's sons. Defendant recounted that Troy and Sherry had marital discord, and, consequently, Troy would leave their home for a couple of weeks at a time. During those times, Defendant would visit him at his father's home. Defendant testified he never spent the night at their home during the periods of time Troy was not living there. If Defendant slept over, he would sleep on the couch located in the living room, while Beth slept in the room shared by Khloe and her sisters.

Defendant testified that at the request of her parents, he had taken Khloe hunting in the family's backyard, around 2:00 or 3:00 p.m., but would return from hunting by nightfall. Defendant testified that he and Khloe did not hunt deer in the evening because it was illegal to hunt deer after dark. Defendant testified he was never alone with Khloe in Troy's deer blind at night, but that there were times when they would go out together to the picnic table and spotlight for coyotes. Defendant denied ever engaging in any sexual activities with Khloe.

Defendant also recounted that Khloe had visited his grandparents' home with her sister two or three times but had never come alone. Defendant testified that he and Khloe had played video games in a bedroom but that the bedroom door was open

- 9 -

and that Khloe never came into his room at any other time. Defendant further reported that Khloe would never have stayed home from church when she spent the night because his "grandparents don't allow that." Defendant testified that his grandmother stayed at home most of the time in order to watch Beth and other children who visited and that she had a habit of "peeking in and checking in," as well as walking past doors and looking in when visitors came to her home.

Defendant testified that, since moving to North Carolina, he had girlfriends with whom he had sexual relationships and that none of these sexual interactions occurred at his grandparents' home. Defendant also reported that he engaged in contraceptive practices including using a condom, and, when a condom was not available, Defendant utilized the pull-out method.

When asked about his cellphone, Defendant testified that it could have been in May 2015 that he bought the phone upon which the search warrant was executed, but he did not buy it in order to hide any previous contact with Khloe. Defendant testified he never used Snapchat during the period between 2012 and 2015. While Defendant might have downloaded the application to chat with Danielle on one occasion in 2015, Defendant stated he did not communicate with Khloe over Snapchat. Defendant and Khloe did exchange messages over Facebook messenger, but Defendant explained that the messages were not sexual in nature. Defendant denied exchanging nude photos with Khloe over any method of communication.

On cross-examination, Defendant was asked by the State prosecutor about his

relationship with Danielle, at which point Defendant testified that they had slept together once before entering into a relationship. The prosecutor questioned Defendant about several text message exchanges with Danielle. In an exchange on 5 July 2015, during a discussion about the size of Danielle's breasts, Defendant mentioned that he had seen her breasts once before they began dating. The texts that were read aloud during the trial stated that Danielle did not "remember taking [her] shirt off," at which Defendant replied, "You didn't, but we were messing around on the couch, and you let me pull them out at the top of the top." Danielle responded that she did not remember the incident, and Defendant texted, "You did get drunk pretty fast." The prosecutor then asked:

> Q: She was so drunk, she couldn't remember taking her shirt off, and you had sex with her?
>
> A: No, I mean, we were drinking with her and her cousin.
>
> Q: She was so drunk, she couldn't remember taking her shirt off?

Defense counsel objected to the prosecutor's last question, and the court sustained the objection. The prosecutor also questioned Defendant about another text message exchange in which he and Danielle discussed trying to find a place to engage in sexual activity because Defendant's grandparents prohibited Defendant's girlfriends from staying at their home. In the exchange, Defendant proposed: "We could go get another motel [room] but I hope [Beth] doesn't say anything to my grandparents." Danielle asked Defendant if he could "ask her not to say anything?"; Defendant

responded, "Yeah, but she has a big mouth[,] but I can try."

On 9 August 2021, the jury found Defendant guilty of four counts of rape of a child and six counts of sex offense with a child. The trial court consolidated the charges in 15 CRS 50792-93, sentencing Defendant to an active term of 300-420 months, and then consolidated the charges in 15 CRS 50794-96, sentencing Defendant to a consecutive active term of 300-420 months. Defendant gave oral notice of appeal in open court and filed a written notice of appeal on 13 August 2021.

## II. Analysis

### A. Introduction of Defendant's Text Messages into Evidence.

On appeal, Defendant argues that the trial court committed plain error by allowing the State to introduce into evidence two text message exchanges between Defendant and Danielle. Defendant contends that the first text message conversation, which discussed Defendant's prior sexual encounter with Danielle when she was intoxicated, was not relevant "to show that he had any plan or intent to sexually assault [Khloe]." Additionally, Defendant argues that the text conversation in which he and Danielle discussed a plan to meet at a motel and in which he considered asking his daughter not to report this plan to her great-grandparents does not indicate that he "had a plan or intent to abuse [Khloe]." According to Defendant, such evidence showcasing his prior sexual relationship was inadmissible for any valid Rule 404(b) purpose; thus, this improper character evidence was prejudicial. We agree.

"[T]o preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). Where an objection about the admissibility of evidence is not preserved at trial, the issue may be raised on appeal based on "plain error" if the defendant shows that the admission was a fundamental error with a "probable impact on the jury's finding that the defendant was guilty" and "absent the error the jury probably would have reached a different verdict." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "The plain error rule applies only in truly exceptional cases." *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986).

Under Rule 404(b), evidence tending to show a defendant committed other wrongs, crimes, or acts, and his propensity to commit such acts, is admissible, provided it is relevant for some purpose other than to show the propensity or disposition of a defendant "to commit an offense of the nature of the crime charged." *State v. Al-Bayyinah*, 356 N.C. 150, 153-54, 567 S.E.2d 120, 122 (2002) (citing *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990)). "[T]he admissibility of evidence of a prior crime must be closely scrutinized since this type of evidence may put before the jury crimes or bad acts allegedly committed by the defendant for which he has neither been indicted nor convicted." *State v. Jones*, 322 N.C. 585, 588, 369 S.E.2d 822, 824 (1988).

Examples of purposes for which evidence of other crimes, wrongs, or acts is admissible include: "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident," but the enumerated list of permissible purposes in the rule is not exclusive. *State v. Bagley*, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987); N.C. Gen. Stat. § 8C-1, R. 404(b) (2022). Accordingly, evidence of " 'other crimes, wrongs, or acts' . . . need only be 'relevant to any fact or issue other than the character of the accused' to be admissible." *State v. Gordon*, 228 N.C. App. 335, 338, 745 S.E.2d 361, 364 (2013) (quoting *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986)).

Even if relevant, 404(b) evidence is also "constrained by the requirements of similarity and temporal proximity." *Al-Bayyinah*, 356 N.C. at 154, 567 S.E.2d at 123, *appeal after new trial*, 359 N.C. 741, 616 S.E.2d 500 (2005). "Evidence of a prior bad act generally is admissible under Rule 404(b) if it constitutes 'substantial evidence tending to support a reasonable finding by the jury that the defendant committed the *similar* act.' " *Id. at* 155, 567 S.E.2d at 123 (citing *State v. Stager*, 329 N.C. 278, 303, 406 S.E.2d 876, 890 (1991)).

Under Rule 404(b) a prior act or crime is sufficiently similar to warrant admissibility if there are "some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both." *Stager*, 329 N.C. at 304, 406 S.E.2d at 890-91 (citations omitted). The similarities are not required to "rise to the level of the unique and bizarre." *State v. Green*, 321 N.C. 594,

604, 365 S.E.2d 587, 593 (1988).

In *State v. Dunston*, appealing his convictions of first-degree sex offense with a child and taking indecent liberties with a child, the defendant argued that the trial court erred in admitting his wife's testimony that she and defendant engaged in anal sex. 161 N.C. App. 468, 469, 588 S.E.2d 540, 542 (2003). This Court determined that a defendant who "engaged in and liked consensual anal sex with an adult, whom he married, [was] not by itself sufficiently similar to engaging in anal sex with an underage victim beyond the characteristics inherent to both, i.e., they both involve anal sex, to be admissible under Rule 404(b)." *Id.* at 473, 588 S.E.2d at 544-45. Finding the evidence "was not relevant for any purpose other than to prove defendant's propensity to engage in anal sex," this Court held the trial court erred in admitting this testimony. *Id.*

Additionally, in *State v. Davis*, this Court held that a defendant who previously "wrote about having non-consensual anal intercourse with an adult woman whom he knew" did not constitute a prior action that was substantially similar to his present charges involving "anal penetration of defendant's six-year-old son" as the only overlapping fact between the two actions was anal intercourse. *State v. Davis*, 222 N.C. App. 562, 567, 731 S.E.2d 236, 240 (2012). We further stated:

> While 'the Court has been markedly liberal in admitting evidence of similar sex offenses to show one of the purposes enumerated in Rule 404(b), . . . [n]evertheless, the Court has insisted the prior offenses be similar and not too remote in time.' *State v. Scott*, 318 N.C. 237, 247, 347

> S.E.2d 414, 419-20 (1986). Here, apart from the fact that anal intercourse was involved, the acts bore no resemblance to each other, involving different genders, radically different ages, different relationships between the parties, and different types of force.

*Id.* at 568, 731 S.E2d at 241.

Here, the charged crimes involve a girl between the ages of eight and eleven years old when the alleged sexual abuse occurred. In contrast, the 404(b) evidence involved a text message conversation between Defendant and a former girlfriend discussing an isolated, consensual sexual encounter they shared before formally dating. Further, there is no similarity in how the charged crimes and these 404(b) offenses came to occur other than the allegation that both involved sexual intercourse.

While the text message conversation mentioned that Danielle had been drinking during the time of their sexual encounter, there is no record evidence that Defendant provided Khloe with alcohol or that she was impaired during the alleged sexual offenses. Likewise, the locations of the alleged offenses and the 404(b) offense are dissimilar: there is no evidence that Defendant and Khloe participated in drinking and afterwards, engaged in sexual activities while others were present. In contrast, Defendant, Danielle, and her cousin drank together culminating with Defendant and Danielle "messing around on the couch." The evidence, presented through a text message conversation, that Defendant previously engaged in consensual sexual intercourse with an adult woman who had been drinking is not sufficiently similar to show that Defendant possessed any plan or intent to engage in

sexual acts with Khloe.

Additionally, Defendant and Danielle's text exchanges regarding a plan to meet at a motel and his possibly asking his daughter not to report this plan to his grandparents is not sufficiently similar to the charged offenses. The text message exchange, which was admitted into evidence, involved Defendant considering whether to ask that his daughter not tell his religious grandparents that he was having consensual sexual intercourse with an adult woman with whom he was in a relationship. However, there is no evidence that Defendant actually had this discussion with his daughter. Even though Defendant's daughter is similar in age to Khloe, contemplating asking his child to withhold highly personal information from relatives is not sufficiently similar where Defendant is alleged to have asked Khloe not to disclose her own sexual abuse. We hold that Defendant's text message exchanges with Danielle do not give rise to any inference that Defendant "would be desirous of or obtain sexual gratification" from sexual intercourse with an eight-to-eleven-year-old girl. *Davis*, 222 N.C. App. at 570, 731 S.E.2d at 241-42.

We further agree that "Rule 404(b) evidence carries an inherent risk of prejudice; by its very nature, it informs the jury about the defendant's prior bad acts and impugns his character." As this Court has previously recognized, the improper admission of a prior sexual deviance by a defendant

> tends to bolster an alleged victim's testimony that an assault occurred *and* that the defendant was the perpetrator, since such evidence informs the jury that the

> defendant has committed sexual assault in the past. This evidence further tends to diminish the defendant's credibility, and creates the possibility that the jury will convict the defendant based upon the prior bad act instead of solely on properly admitted evidence.

*State v. Gray*, 210 N.C. App. 493, 521, 709 S.E.2d 477, 496 (2011). Here, the evidence portraying Defendant as manipulative by (1) engaging in sexual intercourse with a woman who had been drinking alcohol, and (2) for contemplating asking his daughter to not share his plans to meet a girlfriend at a motel so they could engage in sexual intercourse is highly prejudicial and impermissibly attacked Defendant's character.

Given the sensitive and potentially inflammatory nature of the Rule 404(b) evidence, "it is highly probable this testimony was prejudicial to defendant, especially in light of the inconsistent and unclear nature of the remaining evidence in this case." *Dunston*, 161 N.C. App. at 473-74, 588 S.E.2d at 545. Here, Khloe testified she had sexual intercourse with Defendant between the ages of eight to eleven, but the State's witness, Ms. Browning, testified that Khloe's 2015 medical exam found no physical evidence of sexual abuse, sexually transmitted diseases, or pregnancy, and the physical exam was characterized as "an unremarkable or normal exam for a child [of Khloe's] age when it was done."

Further, there were no eyewitnesses to the several years of alleged abuse, despite both Khloe's mother and Defendant's grandmother continuously being present at their respective homes to watch the children in their care. Neither Khloe's mother nor Defendant's grandmother testified that they had ever seen any

questionable behavior or inappropriate interactions between Defendant and Khloe. Additionally, Agent Anderson testified that after conducting a data extraction on Defendant's cell phone, he was unable to find any evidence of nude photograph exchanges or locate any history of communications between Defendant and Khloe. Sgt. Lewis also provided testimony that he did not personally observe a mole in Defendant's pubic line or on his penis, in contradiction to Khloe's description of Defendant's body.

Finally, Defendant denied the allegations against him and testified to events which rebutted Khloe's testimony. Thus, the outcome of the case "depended upon the jury's perception of the truthfulness of each witness." *State v. Maxwell*, 96 N.C. App. 19, 25, 384 S.E.2d 553, 557 (1989). The improperly admitted evidence bolstered Khloe's testimony, diminished Defendant's credibility, and made it more likely that the jury would convict Defendant based on his character, rather than the facts presented. *Gray,* 210 N.C. App. at 521, 709 S.E.2d at 496.

The trial court therefore erred, under the facts and circumstances of the instant case, in admitting evidence of Defendant's text message exchanges with a previous girlfriend under Rule 404(b) of the North Carolina Rules of Evidence. Because this error tended to be highly prejudicial to Defendant, such that it had a probable impact on the jury's finding that he was guilty, Defendant is entitled to a new trial. *Dunston*, 161 N.C. App. at 474, 588 S.E.2d at 545.

**B. State Prosecutor's Closing Argument.**

Next, Defendant argues that the trial court erred by failing to intervene *ex mero motu* in response to several statements made by the State prosecutor during his closing argument. While we disagree with a portion of Defendant's argument, part of his argument has merit.

During closing arguments, a lawyer is "to provide the jury with a summation of the evidence, which in turn serves to sharpen and clarify the issues for resolution by the trier of fact and should be limited to relevant legal issues." *State v. Jones*, 355 N.C. 117, 127, 558 S.E.2d 97, 103 (2002) (cleaned up). In a criminal jury trial, our General Assembly has enacted specific guidelines for closing arguments:

> During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230 (2022). "[A]rgument of counsel must be left largely to the control and discretion of the presiding judge and . . . counsel must be allowed wide latitude in the argument of hotly contested cases." *State v. Monk*, 286 N.C. 509, 515, 212 S.E.2d 125, 131 (1975). Nonetheless, this wide latitude is limited: a closing argument must: "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences

drawn only from evidence properly admitted at trial." *Jones*, 355 N.C. at 135, 558 S.E.2d at 108.

Because Defendant's attorney did not object to the State's closing argument, "defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. 'To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *State v. Tart*, 372 N.C. 73, 80-81, 824 S.E.2d 837, 842 (2019) (quoting *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998)). "Even when a reviewing court determines that a trial court erred in failing to intervene *ex mero motu*, a new trial will be granted only if 'the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.' " *Id.* at 82, 824 S.E.2d at 842 (quoting *Jones*, 355 N.C. at 131, 558 S.E.2d at 106). In order to assess whether this level of prejudice against Defendant has been shown, the challenged statements are considered "in context and in light of the overall factual circumstances to which they refer." *Id.* at 82, 824 S.E.2d at 843 (citation omitted).

Defendant identifies several portions in the State's closing argument which he asserts is grossly improper. First, in recounting Defendant's relationship with Khloe and the time they spent together, the State Prosecutor stated:

> [T]he evidence is uncontradicted from his own house, he
> played Call of Duty with her, video games. Call of Duty, a
> video game with a mature rating, a war game where you

use a control to shoot and kill people. It's full of gore, smoking, profanity, sex scenes. And he is doing this with a girl who has not even reached the fifth grade yet.

Defendant argues that there was no evidence introduced at trial that "the game had a mature rating, or that it involved shooting other people, or that it contained gore, smoking, profanity, or sex scenes." We disagree. In the above cited instance, the State prosecutor's statement represented legitimate inferences from the evidence that was presented by the testimonies of Defendant, Khloe, and the SBI Agent in describing the video game. Call of Duty is a well-known video game. To the extent that the State described details about the game that go beyond common knowledge, the remarks were not grossly improper or so extreme and of such a magnitude that their inclusion in the State's argument prejudiced Defendant by rendering the proceedings fundamentally unfair.

Next, Defendant contests the State prosecutor's statement regarding Khloe's decision to testify against Defendant and referred to Defendant's trial attorney:

> [Khloe] got up on that stand knowing that [Defendant's attorney] has her recorded interview from that October of 2015 date and that she's going to try to cast her in the worst light she can, and that she's going to try to trip her up . . . [Khloe] got on that stand knowing what she was facing[.]

Defendant argues that these remarks were improper and denigrated the trial attorney's role as defense counsel. We disagree. The prosecutor's remarks did not denigrate Defendant's attorney or her duty to confront witnesses, as it described the process of cross-examination and thus, was not grossly improper.

Next, Defendant objects to the prosecutor's remarks concerning Defendant's grandmother providing the bond money for Defendant to be released from jail shortly after his arrest: "[H]e only spent a few days in jail before she posted his bond and he got out. He got out shortly after that nontestimonial identification order. Free as a bird." Defendant argues that this comment "had no connection to the evidence in the case," and encouraged the jury to convict him "because he had suffered no consequences to that point." Again, we disagree as the remark about Defendant's limited time in jail was connected to the evidence where Defendant testified that he had been out of jail on bond since his arrest, and, thus, this statement cannot be classified as an extreme or grossly improper comment.

Next, Defendant argues that the prosecutor made two grossly improper remarks during closing argument which warranted intervention *ex mero motu* by the trial court. During closing, the State prosecutor discussed Defendant's use of birth control during sexual intercourse and remarked:

> An eight- to eleven- year-old child having sex with a man 16 years her senior who by his own testimony is sleeping with other women in this community with no protection. You think about that. You think about an eight- or nine-year old walking around pregnant. You think about an eight- or nine-year-old poking around with herpes or gonorrhea or syphilis or Aids [sic].

The State prosecutor also addressed Defendant's sexual history with Danielle, and their text message exchange discussing their first sexual engagement:

> Who is [Defendant]? . . . Danielle, a woman who when he

- 23 -

was developing a friendship, his first sexual encounter with her involved taking her boobs out of her shirt and having intercourse with her and you've seen the text messages to show that she was too drunk to even remember it[,] to even remember taking her shirt off.

We agree that the prosecutor's comments concerning Defendant's condom usage and sexually transmitted diseases were unsupported and inflammatory, as it appealed "to passions or prejudice." *Tart*, 372 N.C. at 80, 824 S.E.2d at 842 (quoting *Jones*, 355 N.C. at 135, 558 S.E.2d at 108). While Defendant testified that he usually wore condoms with his adult sexual partners, there was no evidence that he or any of his sexual partners had herpes, gonorrhea, syphilis, or AIDS. The prosecutor's statements that Defendant was sleeping around with women in the community with no protection and possibly spreading sexually transmitted diseases was unsupported and inflammatory. Additionally, the record evidence does not show that Khloe became pregnant or contracted any type of sexually transmitted disease from Defendant. In fact, based on Dr. Suttle's medical examination there were no significant findings of lesions, tears, venereal disease, or pregnancy present in Khloe's medical exam.

This remark "cannot be construed as anything but a thinly veiled attempt to appeal to the jury's emotions" by inferring that Defendant had impregnated Khloe and given sexually transmitted diseases to her as a result of unprotected sexual intercourse. The prosecutor's argument was improper as "it referred to events and circumstances outside the record" and "attempted to lead jurors away from the

evidence by appealing instead to their sense of passion and prejudice." *Jones*, 355 N.C. at 132, 558 S.E.2d at 107. Additionally, the State's remarks about Defendant's sexual history with Danielle were impermissible character attacks based on improperly admitted evidence. Such comments are so highly prejudicial and tend to infect the trial with such unfairness, that the trial court erred by failing to intervene *ex mero motu* or otherwise instruct the jury to disregard them.

The impact of the prosecutor's statements in question, which conjure up inaccurate images of Defendant as sexually manipulative, promiscuous, and a carrier of sexually transmitted diseases, is too contaminating to be easily removed from the jury's consciousness, thus infecting the entire trial. Consequently, we hold the disparaging remarks made by the State prosecutor were grossly improper and prejudicial, and the trial court erred by failing to intervene *ex mero motu* in response to the grossly improper and prejudicial statements made by the State prosecutor during his closing argument. As we have already held Defendant is entitled to a new trial, it is unnecessary to address Defendant's remaining arguments. *State v. Dunston*, 161 N.C. App. 468, 474, 588 S.E.2d 540, 545 (2003).

### III. Conclusion

For the reasons stated above, we conclude that, due to the plain errors made by the trial court, Defendant is entitled to a new trial. Therefore, we reverse and remand for a new trial. It is ordered.

REVERSED AND REMANDED.

Judge COLLINS concurs.

Judge DILLON dissents by separate opinion.

DILLON, Judge, dissenting.

Because I believe that Defendant has failed to show reversible error, I respectfully dissent.

The majority takes issue with the prosecution's cross examination of Defendant concerning his sexual encounters with an adult woman friend which included an encounter when the woman was drunk. However, Defendant's counsel did not object to the questioning. Arguably, the questioning was not error, as the defense opened the door to the questioning by asking Defendant on direct about his relationship with this adult woman. Even if the questioning about Defendant's inappropriate behavior with the adult woman was inadmissible under our Rules of Evidence, I do not believe the trial court committed error by failing to intervene.

The majority also takes issue with the prosecutor's statements during closing regarding Defendant's sexual relationship with the adult woman that was outside any evidence presented, notably that Defendant could have transmitted an STD or impregnated the pre-teen victim. Perhaps these statements were inappropriate. However, Defendant's counsel did not object or ask for any instruction concerning these statements. And, assuming these statements were inappropriate, I do not believe the trial court erred by failing to intervene when the prosecutor made these statements during closing.

*DILLON, J., dissenting*

Even assuming the above-described testimony and prosecutor statements constituted error, I do not believe the error constituted plain error. It is certainly *possible* a juror may have some reasonable doubt that the abuse occurred *until* hearing the inappropriate testimony regarding Defendant's encounter with his adult friend and the inappropriate statements during prosecutor's closing. Indeed, the State's case relied primarily on the victim's credibility, as there was no physical or third-party eyewitness evidence of the abuse. But I do not believe Defendant has met his burden to show that the jury's verdict *probably* would have been different had the jury not heard this testimony or statements.[2]

I have reviewed the other arguments raised by Defendant and conclude that none of them warrant a new trial. Accordingly, my vote is "no error."

---

[2] See my dissent in *State v. Watkins*, 277 N.C. App. 386, 857 S.E.2d 36 (2021), discussing how the burden to show plain error, as established by our Supreme Court, is higher than the burden set by the United States Supreme Court to show ineffective assistance of counsel: Plain error requires a showing that a different result *probably* would have occurred, whereas an IAC error merely requires a showing a *reasonable probability* that the result would have been different.